## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

RONALD MONTOYA,

     Plaintiff,

v.

PROGRESS RAIL SERVICES
CORPORATION,

     Defendant.

No. 14-CV-1009-BRB-CG

## ORDER GRANTING DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT
## AND DENYING PLAINTIFF'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT

**BALDOCK**, Circuit Judge.[*]

Plaintiff Ronald Montoya, a middle-aged Hispanic male and career military veteran, complains that his former employer, Defendant Progress Rail Services Corp. (PRS), engaged in race discrimination and retaliation against him, all in violation of 42 U.S.C. § 1981. Before the Court is PRS's motion (Doc. 51) for summary judgment on both claims and Plaintiff's motion (Doc. 55) for summary judgment on his retaliation claim. Upon motion, a district court should enter summary judgment pursuant to Fed. R. Civ. P. 56(a) if the evidence "shows that there is no genuine

---

[*] Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit Court of Appeals, sitting by designation pursuant to 28 U.S.C. § 291(b).

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In determining whether a genuine issue of material fact exists for trial, the court must view the evidence in a light most favorable to the party opposing the motion.  But the mere existence of *some* factual dispute will not frustrate an otherwise proper summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986).  Considering the evidence "through the prism of the substantive evidentiary burden," the Court must determine whether evidence exists upon which a fact finder could find a verdict for the party opposing the motion.  <u>Id.</u> at 254.  Applying this standard, the Court grants PRS's motion, denies Plaintiff's motion, and awards PRS summary judgment on the entirety of Plaintiff's complaint.

## I.

PRS, a subsidiary of Caterpillar Inc., supplies railroad and transit system products and services.  Sometime in early 2014, PRS was awarded the contract to operate Union Pacific's (UP) Santa Teresa, New Mexico facility.  PRS named Aaron Olson, a white male, the interim car repair manager of the facility.  At the outset of his assignment, PRS advised Olson that some tension existed between UP's unionized workers and PRS's non-unionized crew because the latter had been awarded the facility contract over the former.  To staff PRS's operations in Santa Teresa, Olson personally hired carmen, 75% of whom were Hispanic.  Olson hired Plaintiff as a "Carman II," a position requiring physically demanding tasks related to railcar maintenance.

At the time of his hire, PRS provided Plaintiff a "Code of Conduct" and informed him that, like all new carmen employed at the facility, he was on probationary status for the first ninety days of his employment.  Before commencing work on April 1, 2014, Plaintiff executed a document entitled "Introductory Period Acknowledgment."  The document states:  "The introductory period is intended to give new employees the opportunity to demonstrate their ability to achieve a satisfactory level of performance . . . .  Progress Rail Services may end the employment relationship at will at any time during or after the introductory period with or without cause or advance notice."

Just over three weeks later, on April 23, 2014, Olson terminated Plaintiff's employment at PRS.  The "Employment Termination Form" provided the following explanation for Plaintiff's termination:

> Mr. Ronald Montoya is being terminated due to him working outside the chain-of-command to resolve what he considered to be an issue of disrespect.  Mr. Montoya took it upon himself to address Union Pacific management with an issue that had already been addressed and resolved.  Ronald had (in the short time with us) 3 to 4 different significant conflicts that gave others the impression he was working outside the guidelines.  His personality conflicts were perhaps the most disconcerting; e.g. his second day he was observed arguing vehemently with another contractor in the lunch room concerning a matter of little importance.

### A.

On April 9, 2014, two weeks prior to Plaintiff's termination, Olson asked Plaintiff and another PRS employee, German Avila, to help him exchange a defective "EOT" at the UP rail yard warehouse.  An EOT, also known as an EDT, is a device

3

mounted on the end of freight trains in lieu of a caboose.  The warehouse was a short drive from the Santa Teresa facility.

Once the three men arrived at the warehouse, Plaintiff and Avila removed the EOT from the truck bed.  Meanwhile, Olson approached a UP foreman whom he identified only as "Tom."  At this time, two men identified only as UP employees were resting against the frame of the warehouseman door observing the interaction. At his deposition, Olson described the scene as he recalled:

> I was in conversation with Tom that we would need additional help to back order a piece of equipment and to use their system to do so.  The man in question in the rear of the door frame, as he was leaning against the door, kind of gave an exacerbated, disgusted, exhaustive-like huff, and under his breath he said, "We need to train these guys to do that, too?", in disgust.  I challenged him, didn't feel his assessment of us was fair, so I took a step toward him and I asked him if he had any issues. I said, "Do you have any problems?", without saying anything further. It was then, to the best of my recollection, that he told us that it wasn't his responsibility or anyone at Union Pacific to teach us "scabs" how to do our job.
>
> I understood that to be a situation that I wouldn't be able to resolve. . . . [S]o I told the individuals who were with me to get inside the vehicle. And they were both sitting by the overhead door as this confrontation was happening.  And I put my hands up in show of disgust myself and just walked away.

Olson Dep. at 44–45.

In a written statement prepared in November 2014 at the behest of PRS, Avila recalled a similar though not identical version of the encounter:

> [T]wo individuals walked into the building from an entrance door located in the rear of the building, they both made some comments but I was too far to hear what exactly they had said. . . . [O]ne of the

4

individuals that had entered the building from the back continued making comments, at that time I thought I heard "spics", he seemed angry about something, both Mr. Olson and Mr. Montoya started walking towards the bay door and the individual continued making comments and then Mr. Olson turned around and asked the individual if he had a problem.  The individual yelled out, "Yeah get out of here you scabs."

Avila Stmt. at 1.

Plaintiff, during his deposition, provided a third version of the warehouse encounter:

[I]n the warehouse there was a door . . . about 10, 12 feet away from where we were.  Two young gentlemen pushed the door open, looked at me, pointed to me and said, "You, you're a scabber." . . .  I looked at the gentlemen . . . and Mr. Olson is looking also.  And . . . they said, "Yeah, that's right. You, you." . . .

They said, "Yeah, you fucking spic, you wetback."  You know, in those words, exact words.  You know, "Do you understand?"  That's what they said.  And I looked at them and I looked at Mr. Olson.  I said, "You know, what's going on?"  I told Mr. Olson . . . "I don't need this." . . .  After that I told Mr. Olson, "What's wrong?  Why did they say those things?"  I got upset.

Montoya Dep. at 63–64.

As described, Olson briefly confronted the unidentified UP employee(s), and then instructed Plaintiff and Avila to get inside the truck.  Avila asked Olson "what exactly had that individual stated."  Avila Stmt. at 1.  Olson told him the two UP employees called Plaintiff and Avila "scabs" because they felt Plaintiff and Avila had taken their jobs.  Avila stated that Olson apologized for the behavior of the UP employees at the warehouse, and "then immediately got on the phone and called

someone to report the incident." Id. During the short drive back to the Santa Teresa facility, Olson first phoned Jeff Thompson, UP's general foreman, and then Felice Wilson, UP's rail yard manager, to report the incident. Plaintiff heard Olson, who was upset at the disrespect shown his employees, on his cell phone explaining "this shouldn't be happening" and "was uncalled for." Montoya Depo. at 74.

During the return trip, Olson was largely nonresponsive to Plaintiff's inquiries about the incident. Instead of explaining the relationship between unionized and non-unionized workers, Olson told Plaintiff that he was too new with PRS and would not understand. Olson asked Plaintiff whether he was familiar with the term "scab." Plaintiff indicated he was not. Olson testified that "[o]n the return trip home, as we discussed the use of the word "scab," [Plaintiff] made no indication that he had heard something different." Olson Dep. at 52–53.

When asked during his deposition whether he had heard the racial slurs about which Plaintiff presently complains, Olson stated he had not.

> Q.   What else do you recall the men at the facility having called you or Mr. Montoya, [or] Mr. Avila?
> A.   There wasn't anything other than "scab."
> Q.   That you recall?
> A.   That I recall. Now I was closest to these individuals, and in the process of what had been said, I wasn't aware that they had said anything prior to the request that I'd asked Tom to help us with the computer issue. . . .
>
> * * *
>
> Q.   You understand that Mr. Montoya, that . . . what he's testified to is different from what you're testifying to?
> A.   I'm aware that there's a difference.
> Q.   That Mr. Montoya has testified and has made a claim in this

6

lawsuit that he was called a "wetback" and a "spic"?

A.     I did not hear those words.

Id. at 47, 49.[1]

## B.

After returning to the Santa Teresa facility, Olson reported the warehouse incident a third time. This time he reported the incident to his immediate supervisor, PRS western region general manager Todd Stambaugh. Olson explained in his deposition that "[i]t didn't go any further because what was said by this individual in the doorway wasn't considered to be a racial slur, [but] had more to do with the union versus nonunion position." Id. at 50–51. Stambaugh confirmed neither Olson nor anyone else informed him that Plaintiff had been referred to as a "spic" or "wetback" while employed at PRS. Stambaugh Dep. at 31–32. Stambaugh stated he learned of Plaintiff's version of the incident only upon being deposed. Id.

Olson also informed Adam Julian of the warehouse incident. Julian was the PRS supervisor assigned to manage the Santa Teresa facility while Olson took a pre-planned trip to California to attend to personal business. Olson left for California

---

[1] At his deposition, Plaintiff said Avila told him he heard the UP employees use the terms "spic" and "wetback" during the confrontation at the UP warehouse. Montoya Dep. at 64. This, of course, is in tension with Avila's own statement. But in any event, as an out-of-court declaration offered to prove the truth of the matter asserted, Avila's purported oral statement to Plaintiff constitutes hearsay inadmissible in its present form. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (a district court may not consider hearsay evidence in a deposition submitted in opposition to summary judgment).

the day after the incident and did not return until April 20, 2014.  At his deposition, Julian stated he was "vaguely familiar with the incident from my recollection.  I believe it happened around the time that I arrived, so I only heard maybe barely anything about it."  Julian Dep. at 10–11.  Julian recalled a discussion he had with Plaintiff following the incident at the UP warehouse but did not "recall racial slurs being involved in the discussion."  Id. at 11.  Nothing in the record suggests that Julian subsequently discussed the matter with either Stambaugh or Olson.

Plaintiff recalled things differently.  The morning after the incident, Plaintiff went to work planning to speak with Olson.  Because Olson had departed for California, Plaintiff met with interim manager Julian instead.  "I was discriminated, and I told Adam that.  I vaguely told him.  I said, 'You know what, I was discriminated.'  And I told him in such words, plain, what had happened."  Montoya Dep. at 81.  Only when asked at his deposition in a leading manner about his use of the words " spic" and "wetback" did Plaintiff state he told Julian what the UP employees had called him.  Id.  According to Plaintiff, Julian told him "[n]othing could be done about it," so "[i]gnore it."  Id. at 82.

Plaintiff did not do as instructed.  Over his lunch hour on the same day, Plaintiff walked to the UP facility manager's office.  Because the door was secure and Plaintiff did not have a pass key, he waited for someone to open the door.  When another individual used his pass key to enter the office, Plaintiff followed him inside. Id. at 83.  Plaintiff spoke with UP's facility manager, who told Plaintiff to file a

8

report with PRS.  The next day, a co-worker suggested Plaintiff contact PRS's human resources department (HR), which he did.  Three days after the UP warehouse incident, Plaintiff contacted Mike Perkins, HR's vice-president.  Perkins told Plaintiff he would look into the matter but never described "specifically" what he would do.  Id. at 94.  Plaintiff acknowledged he had no "personal knowledge" of how Perkins responded to his complaint.  Id. at 95.

C.

Meanwhile, during his brief absence from the Santa Teresa facility, Olson had two phone conversations with Stambaugh about Plaintiff's job performance.

> Q.     What did he [Stambaugh] tell you [Olson] the first time?
> A.     He had asked me if I knew what Mr. Montoya had done, . . . I didn't know and he expressed to me over the phone that Mr. Montoya had gone to the Union Pacific and spoken to a Mr. Rails [the facility manager]. . . .  He was wondering if I was aware that he [Montoya] had taken it within his own hands to inform the Union Pacific of something he felt wasn't addressed properly.
>
> * * *
>
> Q.     And tell me about the second conversation.
> A.     . . . . He [Stambaugh] asked if I had the same impression that other people were having of Mr. Montoya. . . .  [I]t was his determination that he would prefer us not to continue the employment of Mr. Montoya, and that the ultimate decision would be mine, but then he gave me reasons why he felt he would not be a good fit for our company . . . .

Olson Dep. at 55, 57–58.  In an sworn affidavit, Olson further described his second conversation with Stambaugh.  "Mr. Stambaugh expressed to me that Mr. Montoya was not going to make it past his probationary period because he appeared to have

9

conflicts with others, did not follow instructions, and did not act interested or ask thoughtful questions to learn about the work he was performing."  Olson Aff. at 3.

Shortly after Olson returned, he met with Plaintiff.  According to Plaintiff, Olson was upset, saying things such as "I understand that . . . you didn't want to let this incident go or ignore it.  I asked you to let it go and ignore it";  "You don't understand.  I'm the boss. . . . [Y]ou don't want to listen to me.  I don't need a worker like you"; "You don't want to follow directions.  You want to go over me, behind my back"; "I want you to turn in your badge and all your equipment.  You're fired."  Montoya Dep. at 102–03.

Olson's description of his meeting with Montoya is not nearly so vituperative.

I remember asking for Fidel Guerrero to be a witness to the conversation . . . .  I told him [Montoya] that I believed that working outside the chain of command[,] not informing, at least, me of what he considered to be an insult during the . . . same instance where I was witness to what would have been said that if he felt that he was going to progress it further, I told him that I didn't understand that line of thought.  I told him I felt that there was a certain amount of disrespect on his part shown to me. . . .

I told him that we would not be continuing his employment with Progress Rail, . . . these allegations of being argumentative, the allegations of him being what others considered to be a know-it-all and not necessarily stepping in and asking the probing questions that we would expect from a new hire . . . .

Olson Dep. at 65–66.  Olson concluded by telling Plaintiff that PRS had reserved the right to terminate him summarily during his initial ninety day probationary employment period.  This lawsuit followed.

III.

The general framework under which Plaintiff must prove his claims of discrimination and retaliation against PRS is the same.  Crowe v. ADT Sec. Servs., Inc., 649 F.3d 1189, 1194–95 (10th Cir. 2011).  Plaintiff may establish his claims by direct evidence.  "Direct evidence is evidence, which if believed, proves the existence of a fact in issue *without inference or presumption*."  Hall v. United States Dep't of Labor, 476 F.3d 847, 854 (10th Cir. 2007) (emphasis added) (internal quotations omitted).

> Direct evidence requires proof of an existing policy which itself constitutes discrimination, or oral or written statements on the part of a defendant showing a discriminatory motivation.  A statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence.  Statements of personal opinion . . . do not constitute direct evidence of discrimination, but at most, are only circumstantial evidence of discrimination because the trier of fact must infer discriminatory intent from such statements.

Id. at 854–55 (internal citations and quotations omitted).

In the absence of direct evidence, Plaintiff must establish his claims at the summary judgment stage via the shifting standards of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this rubric, Plaintiff must first establish a prima facie case in support of his claims.  If Plaintiff does so, the burden of production (not persuasion) shifts, requiring PRS to come forward with a legitimate, non-discriminatory and not-retaliatory rationale for Plaintiff's termination.  Once PRS comes forward with such rationale, Plaintiff must show Defendant's proffered

11

rationale is pretextual.  Crowe, 649 F.3d at 1195.

A.

The Court first analyzes Defendant's motion for summary judgment on Plaintiff's race discrimination claim.  Plaintiff does not assert, nor could he given the record facts, that direct evidence supports his claim of race discrimination.  So he must establish a genuine issue of material fact for trial on his first claim by way of McDonnell Douglas's shifting standards.  To establish a prima facie case of race discrimination under § 1981, Plaintiff must demonstrate that he (1) was a member of a protected class, (2) was qualified and satisfactorily performing his job, and (3) was terminated under circumstances giving rise to an inference of discrimination.  Salguero v. City of Clovis, 366 F.3d 1168, 1175 (10th Cir. 2004).

Given the record evidence, this Court concludes as a matter of law (apart at this point from any consideration of his job performance) that the facts surrounding Plaintiff's termination do not give rise to an inference of race discrimination.  The problem for Plaintiff is simply this:  Even if Olson heard the use of racial slurs at the UP warehouse, and others at PRS knew about the use of such slurs, one cannot reasonably attribute to Olson, or any other decision maker at PRS, the isolated slurs on a singular occasion of two unidentified UP employees/union members unaffiliated with PRS.  Plaintiff acknowledges that *no one* at PRS ever used "racial epithets" toward him.  Montoya Dep. at 98.  And the Tenth Circuit has told us "[a] stray remark by someone not in a decision-making position does not establish intent

to discriminate." <u>Jones v. Unisys Corp.</u>, 54 F.3d 624, 632 (10th Cir. 1995).  By stronger reason, isolated remarks by someone not in the employ or under contract with PRS surely does not establish an intent to discriminate on the part of PRS.

PRS cannot be held liable for comments made by individuals over whom it had no control or supervisory authority.  Quite frankly, the Court cannot help but wonder what exactly Plaintiff wanted PRS to do about the UP warehouse incident.  Following the incident, a visibly upset Olson immediately apologized to Plaintiff and Avila for the unidentified workers' disrespect, and then promptly reported the incident to UP's general foreman, UP's rail yard manager, and his own supervisor at PRS.  The law surely did not require PRS to convene an inquisition to condemn two unidentified union workers unaffiliated with PRS pursuant to a PRS anti-harassment policy that PRS had no power to enforce against those workers.

Plaintiff's curt argument that his evidence gives rise to an inference of race discrimination on the part of PRS is meritless.  His argument (contained in his response brief) reads in its entirety:  "[T]here is a very short temporal proximity between several acts of *protected conduct*, ranging from 15 days between the first acts of *protected conduct* on April 9, 2014 and his termination, and mere moments as [PRS] fired [Plaintiff] mere moments after again engaging in *protected activity* when he was fired on April 23, 2014."  (emphasis added).  Race, however, is a status, not "conduct" or "activity" in which one engages.  In other words, Plaintiff's argument appears to speak of retaliation rather than race.

In sum, Plaintiff has not put forth sufficient proof to establish by a preponderance of the evidence that any person in the employ or under the control of PRS (1) made discriminatory comments, let alone comments directed toward Plaintiff, (2) approved of such comments made by others, in particular the UP employees at the warehouse, or (3) terminated Plaintiff because of his race.  Nor has he shown the environment at PRS was hostile to his race.  To the contrary, PRS, and in particular Olson, hired multiple Hispanics, including Plaintiff, to work at the Santa Teresa facility just three weeks before terminating him.  That Olson would hire Hispanics on behalf of PRS and then turn around and promptly terminate one of those individuals because he was Hispanic makes no sense.  See, e.g., Olson Aff. at 4 ("During the time period relevant to the complaint, approximately 75–80% of the carmen employed at the Santa Teresa facility were Hispanic individuals whom I hired and supervised.").  Plaintiff presents no evidence that PRS subjected him to racial animus or hostility or that Olson (or anyone else for that matter) made the decision to terminate him on account of such.  For these reasons, the Court grants Defendant PRS summary judgment on Plaintiff's claim of race discrimination.

## B.

Next the Court turns to Plaintiff's partial motion for summary judgment. According to Plaintiff, direct evidence supports his claim of unlawful retaliation and entitles him to summary judgment thereon.  To prevail under the direct evidence approach, Plaintiff must present evidence establishing, absent inference or

presumption, that any protected activity on his part was a but-for cause of his termination.[2]  See Davis v. Unified Sch. Dist. 500, 750 F.3d 1168, 1170 (10th Cir. 2014) (citing Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013) (effectively overruling the mixed motive test for Title VII and § 1981 retaliation claims)).  To establish the requisite causal connection between any protected activity and his termination, Plaintiff initially must show that PRS, or the individual[s] responsible for his termination, knew he was engaging in such conduct.  "An employer's action against an employee cannot be *because* of that employee's protected opposition [to discrimination] unless the employer knows the employee has engaged in protected opposition."  Petersen v. Utah Dept. of Corr., 301 F.3d 1182, 1188 (10th Cir. 2002).  "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his . . . concern that the employer has engaged in a[n] [unlawful] practice."  Dean v. Computer Sci. Corp., 384 F. App'x 831, 839 (10th Cir. 2010) (unpublished) (quoting Hinds v.

---

[2]  Only on rare occasion has the Tenth Circuit held a plaintiff has presented evidence sufficient to satisfy the burden of directly establishing retaliatory motive.  See, e.g., Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 550 (10th Cir. 1999) ("One month after plaintiff's deposition, during which he testified about his race discrimination claim, defendant sent a letter to plaintiff stating: 'As a result of issues raised in your deposition, effective immediately, you are suspended from all duties.'");  Thomas v. Denny's Inc., 111 F.3d 1506, 1512 (10th Cir. 1997) (The testimony of third parties was "that several people involved in the promotion decision process had stated that the [plaintiff] would not be considered for promotion because of his discrimination complaint.").

<u>Sprint/United Mgmt. Co.</u>, 523 F.3d 1187, 1203 (10th Cir. 2008)).[3]  In other words, direct evidence of retaliation is evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting a retaliatory attitude and therefore the prerequisite knowledge of protected activity. See <u>Twigg v. Hawker Beechcraft Corp.</u>, 659 F.3d 987, 1000 & n.8 (10th Cir. 2011) (distinguishing the character of evidence, *i.e.*, direct vs. circumstantial, with the methods of proving retaliation, *i.e.*, direct vs. indirect).

In this case, Plaintiff asserts his two conversations with Olson, the first immediately following the warehouse incident and the second at his termination, and his one conversation with Julian the day after the incident, constitute protected activity because he complained to them of discrimination.  But Plaintiff presents no conduct or statements, written or oral, on the part of any of his superiors at PRS, *i.e.* Stambaugh, Olson, and Julian, that directly reflect knowledge of any protected activity, let alone retaliatory animus.[4]  Despite Plaintiff's insistence otherwise,

---

[3] <u>Dean</u> involved a claim of retaliation brought under Title VII.  The standards applicable to Title VII and § 1981 retaliation claims are the same.  <u>Davis</u>, 750 F.3d at 1170.

[4]  The Court recognizes that Stambaugh, as Olson's superior, possibly influenced Olson's decision to terminate Plaintiff.  For reasons substantially the same as those contained in Plaintiff's termination notice, Stambaugh told Olson that Plaintiff would not make it through the probationary period and his preference was to discontinue Plaintiff's employment with PRS.  See <u>supra</u> at 9–10.  Importantly, the record is quite clear that Stambaugh had no knowledge of Plaintiff's "protected activity" when he expressed his views of Plaintiff's job performance to Olson. Stambaugh Dep. at 31–32.  Because Stambaugh clearly lacked the requisite
(continued...)

16

nothing Olson is reported to have said to Plaintiff while en route from the warehouse or when informing him of his termination is *necessarily* inconsistent with Olson's description of the warehouse incident or the reasons PRS proffered for Plaintiff's termination.  See supra at 5–6, 10.  Rather, one may view Olson's statements as expressing his frustration with Plaintiff's refusal to let go of an incident that, as Olson understood it, had nothing to do with race.  See Hall, 476 F.3d at 855 (explaining that where a statement can plausibly be interpreted in a benign way, such statement does not directly reflect illegal animus.).

As illustrated by the reports he made to both UP and PRS, Olson well understood the incident at the UP warehouse was a tense encounter with union sympathizers.  But Olson stated at his deposition that he had no knowledge the problem involved a racial component.  Maybe that's because Plaintiff never actually told him so.  Plaintiff's deposition testimony indicates that neither at the time of the warehouse incident nor in his final meeting with Olson did Plaintiff report to Olson that he had been called a "wetback" and "spic" by UP employees and wanted PRS to do something about it.  Montoya Dep. at 63–65, 101–05.  The fact that on neither of these two occasions did Plaintiff mention racial discrimination or inform Olson of the racial slurs he heard at the warehouse makes his retaliation claim problematic

---

[4](...continued)
knowledge of any protected activity, Plaintiff's assertion that Stambaugh was in some way responsible for Plaintiff's termination is a dead end.

at best.  See Petersen, 301 F.3d at 1188.

Sure Plaintiff says he complained of race discrimination to both Olson and Julian prior to Olson's decision to terminate his employment.  But both Olson and Julian testified they never understood Plaintiff to be complaining about unlawful discrimination.[5]  Olson stated he did not hear the racial slurs Plaintiff heard at the warehouse.  Olson further stated that prior to his decision to terminate Plaintiff, neither Plaintiff, Julian, Stambaugh, nor anyone else reported to him the UP employees' use of such slurs.

> Q.    [Y]ou understood back then [at the time of the UP warehouse incident] that he [Montoya] had made a report of a racial slur, true?
>
> A.    No, I'm not aware that he made a report.  He did not make a report to me.  On the return trip home, as we discussed the use of the word "scab," he made no indication to me that he had heard something different.
>
> Q.    Do you recall him, or do you know whether or not Mr. Montoya spoke with other members of management concerning his report of these racial slurs of "wet-back" and "spic"?
>
> A.    I'm not aware of any specific conversation that he had with either Mr. Adam Julian, Mr. Todd Stambaugh or anyone else at Progress Rail.  And the only other conversation that I am directly aware of from Mr. Montoya was when I had asked him to come and speak during his termination.

---

[5]  Additionally, as to Julian, nothing in the record suggests the conversation between Plaintiff and Julian, whatever the specifics, went beyond the four corners of Julian's office.  See, e.g., Olson Dep. at 53 (Olson was unaware of any conversations Plaintiff had with Julian or Stambaugh).  Moreover, despite Plaintiff's contrary assertion, the record makes quite apparent that Julian had no input into the decision to terminate Plaintiff.  See, e.g., Julian Dep. at 17–18 (Julian was "in no way" involved in the decision to terminate Plaintiff).  Any argument to the contrary is yet another dead end for Plaintiff.

Olson Dep. at 52–53.

Apart from Avila's underwhelming statement that although he was "too far to hear what exactly they had said," he "thought" he heard the UP employees use the term "spic" at the warehouse, Avila Stmt. at 1, Plaintiff's case rests entirely upon his own say-so. While Plaintiff may disagree with Olson's testimony, he may not testify to what Olson or anyone else at PRS actually heard or knew. See Hall 476 F.3d at 855 ("Statements of personal opinion . . . do not constitute direct evidence of discrimination."). Plaintiff may testify only to what he personally heard, said, and observed during the relevant time period. Consequently, for Plaintiff to prevail on his retaliation claim, a fact finder would have to find Olson's testimony as to his lack of knowledge not credible, and *infer* from Plaintiff's testimony that Olson understood Plaintiff had engaged in protected conduct, *i.e.*, Olson heard the racial slurs at the warehouse and knew Plaintiff complained about such slurs. Direct evidence has no need for such inference. See id. at 854. The Court rejects Plaintiffs argument that direct evidence supports his retaliation claim and entitles him to summary judgment thereon.

## C.

Lastly, the Court turns to Plaintiff's motion for summary judgment on Defendant's retaliation claim. Because he lacks direct evidence, Plaintiff necessarily must establish a genuine issue for trial via the shifting standards of McDonnell

Douglas.[6]  To establish a prima facie case of unlawful retaliation under § 1981, Plaintiff must establish that (1) he engaged in protected opposition to discrimination, (2) he suffered an adverse employment action, and (3) a causal connection is present between the protected activity and the adverse employment action.  Twigg, 659 F.3d at 998.  Largely due to the equivocal nature of Plaintiff's "protected activity," and PRS's reported lack of understanding regarding Plaintiff's belief that he had been the subject of racial slurs, this Court questions whether Plaintiff can satisfy the "but-for" causation element of his prima facie case.  Be this as it may, the Court recognizes that in the Tenth Circuit "[t]he burden of establishing a prima facie case in the McDonnell Douglas framework is not onerous," and that "temporal proximity is sufficient to establish [the causation element of] a prima facie case" because retaliatory motive may be inferred from such proximity.  Lobato v. New Mexico Envtl. Dep't, 733 F.3d 1283, 1293 (10th Cir. 2013) (internal quotations omitted).  So for the sake of brevity the Court simply assumes Plaintiff's evidence is sufficient to establish a prima facie case of retaliation, albeit a weak one.

In response to Plaintiff's prima facie case of retaliation, PRS undoubtedly has articulated legitimate non-retaliatory reasons for his termination.  As reflected in his termination notice, PRS based its decision to terminate Plaintiff's employment

---

[6]  At this point, nothing much remains of Plaintiff's cross-motion for summary judgment on his retaliation claim.  That Plaintiff is nowhere near establishing his entitlement to judgment as a matter of law against Defendant is painfully apparent from the Court's discussion thus far and shall become still more evident in Part C.

principally on his insubordination, in particular his refusal to respect PRS's chain-of-command, and more generally on his inability to get along with others.  See Merrick v. Northern Natural Gas Co., 911 F.2d 426, 430 (10th Cir. 1990) (recognizing insubordination and poor communication skills as legitimate reasons for termination).  The burden now rests upon Plaintiff to establish a genuine dispute regarding whether PRS's proffered explanation for his termination was pretext for unlawful retaliatory animus.

Plaintiff's burden is not light.  Importantly, in examining evidence of pretext, the Court examines the facts as they appeared to PRS and in particular Olson as the final decision maker.  The Court gives no credence to Plaintiff's self-serving subjective evaluation of himself and the situation.  "The relevant inquiry is not whether [PRS's] proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."  Id. (internal brackets and quotations omitted); see also Metzler v. Fed. Home Loan Bank, 464 F.3d 1164, 1179 (10th Cir. 2006).  Moreover, because Plaintiff was hired and fired by the "same actor," namely Olson, within a short time frame, a "strong inference" arises that PRS's stated reasons for terminating Plaintiff were not pretextual. Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1183 (10th Cir. 2006).

Plaintiff may overcome this inference and establish pretext by pointing out "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [PRS's] proffered legitimate reasons for its actions that a reasonable factfinder

could rationally find them unworthy of credence and hence infer that [PRS] did not act for the asserted non-discriminatory reasons." Lobato, 733 F.3d at 1289 (internal quotations omitted).  The Tenth Circuit has opined that an employee generally may establish pretext in one of three ways.  An employee may present evidence that (1) the employer's stated reasons for an adverse employment action are false, (2) the employer acted contrary to a written company policy prescribing the employer's action against the employee under the circumstances, or (3) he was treated differently from other similarly situated employees who violated protocols of comparable seriousness.  Salguero, 366 F.3d at 1176.  Plaintiff fails all three.

Other than his own blanket denials, Plaintiff has presented absolutely no evidence that PRS's stated reasons for his termination are false.  Plaintiff does not, nor could he, dispute that he ran seriously afoul of PRS's chain-of-command when he unilaterally imposed himself upon UP management, thereby further jeopardizing PRS's already strained relationship with UP.  As to his ability to get along with others in the workplace, Plaintiff simply answered  "no" at his deposition when asked if he had any disputes with co-workers, contractors, or others while employed at PRS.  Montoya Dep. at 58.  He offers no corroborating evidence.  Instead, Plaintiff complains ad nauseam that PRS failed to follow its anti-harassment policies or impose progressive discipline upon him.  But the Court has already observed that Plaintiff fails to explain how PRS's might have effectively applied its anti-harassment policies to the two individuals at UP who Plaintiff says discriminated

22

against him.  See supra at 12–13.  And Plaintiff points to no PRS policy that mandates progressive discipline for probationary employees.  See Lobato, 733 F.3d at 1289–91.

To be sure, a disparate application of PRS policies and procedures to Plaintiff might suggest a retaliatory motive.  But Plaintiff offers no evidence to indicate PRS treated him differently than any other similarly situated employee.  In fact, Olson indicated during his deposition that due to the transitionary nature of the operations at the Santa Teresa facility, no employee was written up during its first months of operation.  Olson Dep. at 62.  Plaintiff simply never comes to grip with the terms of his probationary employment at PRS: "Progress Rail Services may end the employment relationship at will at any time during or after the introductory period with or without cause or advance notice."

Undeterred, Plaintiff points to the following additional factors in his efforts to establish pretext: (a) the temporal proximity between Plaintiff's first instance of protected activity immediately following the incident at the UP warehouse and his termination, (b) Olson's and Julian's "dismissive comments exhibiting a retaliatory animus" toward Plaintiff after he complained of race discrimination, and (c) uncertainty as to who actually made the decision to terminate Plaintiff. Unfortunately for Plaintiff, while temporal proximity may be enough to establish a prima facie case of retaliation, it is not sufficient to establish pretext.  Lobato 733 F.3d at 1293.  "[C]lose temporal proximity can support a finding of pretext only in

23

combination with other evidence of pretext," of which Plaintiff has none.  Id.  The Court has already explained why Olson's and Julian's "dismissive comments" to Plaintiff, which like temporal proximity bear more upon his prima facie case than the question of pretext, do not necessarily reflect retaliatory animus and why any uncertainty as to what part Stambaugh and/or Julian played in Plaintiff's termination is beside the point.  See supra 16–19 & nn.4–5.  Enough said.

Plaintiff Progressive Rail Services' motion for summary judgment (Doc. 51) is GRANTED.  Defendant Montoya's motion for partial summary judgment (Doc. 55) is DENIED.  Final judgment in favor of Plaintiff shall be entered.

> Entered for the Court
> this 18th day of May, 2016
>
>
> Bobby R. Baldock
> United States Circuit Judge
> Sitting by Designation